# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

**OFFSHORE SERVICE VESSELS, L.L.C.,**
**ET AL.**

**CIVIL ACTION**

**VERSUS**

**No. 12-1311**

**SURF SUBSEA, INC.**

**SECTION I**

## ORDER AND REASONS

Before the Court is a motion[1] to dismiss filed by defendant, Surf Subsea, Inc. Plaintiffs,

Offshore Service Vessels, L.L.C., Holiday, L.L.C., Nautical Solutions, L.L.C., Harvey Gulf

International Marine, LLC, Hornbeck Offshore Services, LLC, and SEACOR Marine, LLC, have

filed a motion[2] to remand. For the following reasons, the motion to remand is **DENIED** and the

motion to dismiss is **GRANTED**.

## BACKGROUND

Plaintiffs are providers of offshore and subsea services in the Gulf of Mexico who own

and operate multipurpose support and supply vessels certified by the U.S. Coast Guard to engage

in coastwise trade.[3] Plaintiffs allege that Otto Marine, a foreign corporation located in

Singapore, purchased a competing 292 foot, Class II, DP multipurpose support and supply vessel

known as the M/V SURF CHALLENGER.[4] Because a foreign corporation could not take title to

---

[1] R. Doc. No. 11.

[2] R. Doc. No. 14.

[3] R. Doc. No. 1-2, ¶¶ 10, 11.

[4] R. Doc. No. 1-2, at ¶ 12. Plaintiffs allege that, in connection with the bankruptcy proceeding *In re Deep Marine 2, LLC*, United States Bankruptcy Court, Southern District of Texas, No. 09-39316, and jointly administered cases, the vessel was auctioned as the "DMT Emerald" on May 17, 2010. *Id.* Plaintiffs claim that Otto Marine was the

the vessel without forfeiting its valuable privilege to work in the U.S. coastwise trade, plaintiffs claim that Otto Marine created Surf Subsea, Inc. ("Surf Subsea") to own and operate the vessel with a U.S. citizen, Francis Wade Abadie, Jr. ("Abadie"), serving as its president and chief executive officer.[5]

Plaintiffs allege that, after the sale, Abadie obtained a Certificate of Documentation ("COD") with a coastwise endorsement for the SURF CHALLENGER by certifying to the Coast Guard that: (1) Surf Subsea's president and chairman of the board are United States citizens; (2) the corporation has no "alien directors;" (3) title to "75% or more" of the stock is owned by U.S. citizens eligible to document vessels in their own right with an endorsement for coastwise trade; and (4) "[b]y no means whatsoever is control in excess of 25% conferred upon or permitted to be exercised by any person who is not a citizen of the United States."[6] Plaintiffs allege that the Coast Guard then issued a COD with a coastwise endorsement for the vessel, and the SURF CHALLENGER began to engage in coastwise trade in the Gulf of Mexico.[7]

Plaintiffs claim that the vessel was not, in fact, eligible to engage in coastwise trade as represented to the Coast Guard.[8] Plaintiffs allege that when Hornbeck Offshore Services, LLC ("Hornbeck Offshore") attempted to purchase the vessel from Surf Subsea in August 2011, it was advised that Abadie knew nothing concerning the sale, and that Otto Marine held "the power

---

highest bidder, and that the bankruptcy court approved, by order, a sale of the vessel to Otto Marine.  *Id.* at ¶ 13. Plaintiffs allege that, following the sale, the vessel was renamed the "Surf Challenger".  *Id.* at ¶ 22.

[5] *Id.* at ¶¶ 18-19.  Plaintiffs allege that a purchase agreement was entered into between the bankrupt debtor and Otto Marine for the sale of the vessel.  However, plaintiffs allege that the bill of sale for the vessel shows it was purchased from the bankruptcy estate by the newly formed Surf Subsea. *Id.* at ¶¶ 13, 20.

[6] *Id.* at ¶¶ 23-24.

[7] *Id.* at ¶¶ 27-28.

[8] *Id.* at ¶ 33.

and control of the corporation."[9] Plaintiffs contend that Hornbeck Offshore was advised that while the vessel's documented owner was Surf Subsea, all decision-making authority concerning the sale of the vessel came from Lee Kok Wah, President and CEO of Otto Marine, and Yaw Chee Siew, Chairman of Otto Marine.[10] Plaintiffs claim that Hornbeck Offshore ended the negotiations believing that the vessel had been "sold foreign," and that it had lost, or would lose, its eligibility to engage in coastwise trade.[11]

On April 13, 2012, plaintiffs filed this lawsuit in Louisiana state court alleging that Surf Subsea has been using the SURF CHALLENGER to illegally compete with plaintiffs for coastwise work that it is not eligible to perform because of its foreign ownership and/or control.[12] Plaintiffs allege that Surf Subsea intentionally and purposefully included false information in its applications for the COD and/or failed to disclose material information to the Coast Guard regarding the foreign ownership and control of Surf Subsea.[13] Plaintiffs claim that Surf Subsea knew that if the true facts were disclosed, it would not have received a COD with a coastwise endorsement.[14] Plaintiffs claim that Otto Marine and/or other foreign interests exercise total control over the vessel and/or Surf Subsea, and that the U.S. citizens purportedly in control of Surf Subsea have no true power or decision-making authority concerning the ownership of the SURF CHALLENGER.[15]

---

[9] *Id.* at ¶¶ 30-31.

[10] *Id.* at ¶ 30.

[11] *Id.* at ¶ 32.

[12] *Id.* at ¶ 33.

[13] *Id.* at ¶ 26.

[14] *Id.*

[15] *Id.* at 29.

In Count I of their complaint, plaintiffs seek a declaratory judgment pursuant to article 1871, *et seq.*, of the Louisiana Code of Civil Procedure that the COD with a coastwise endorsement issued to the SURF CHALLENGER is invalid because Surf Subsea does not satisfy the citizenship requirements for that federal license.[16]   Specifically, plaintiffs seek a final judgment declaring:

> (1)  that title to at least 75 percent of the stock of [Surf Subsea] is not vested in citizens of the United States, or, alternatively, that although the requisite percentage of stock is titled and vested in United States citizens, it is subject to a trust or fiduciary obligation in favor of a person not a citizen of the United States;
>
> (2) that less than 75 percent of the voting power in [Surf Subsea] is vested in citizens of the United States;
>
> (3) that there exists a contract or understanding by which more than 25 percent of the voting power in [Surf Subsea] may be exercised, directly or indirectly, in behalf of a person not a citizen of the United States;
>
> (4) that there exist other means by which control of more than 25 percent of any interest in [Surf Subsea] is given to or permitted to be exercised by a person not a citizen of the United States; and
>
> (5) that [Surf Subsea] is not a citizen of the United States for the purposes of operating a vessel in the coastwise trade.[17]

In Count II of their complaint, plaintiffs seek a permanent injunction pursuant to article 3601(A) of the Louisiana Code of Civil Procedure prohibiting Surf Subsea from operating the SURF CHALLENGER in coastwise trade based upon their allegation that Surf Subsea operated

---

[16] *Id*. at ¶¶ 34-37.

[17] *Id.*

the vessel without a valid coastwise endorsement.[18]  Plaintiffs allege that they are not required to show irreparable injury to obtain the injunction because Surf Subsea's conduct is unlawful.[19]

In Count III of their complaint, plaintiffs seek damages pursuant to the Louisiana Unfair Trade Practices and Consumer Protection Law ("LUTPA"), La. Rev. Stat. § 51:1401, *et seq.*[20] Plaintiffs claim that Surf Subsea has engaged in unfair or deceptive acts or practices by operating the SURF CHALLENGER with an invalid coastwise endorsement and, as such, they are entitled to recover damages for lost business, revenue and/or profits as competing providers of offshore and subsea services in the Gulf of Mexico.[21]  Plaintiffs further claim that Surf Subsea's actions were knowing and intentional such that they are entitled to receive three times the actual damages sustained.[22]

On May 21, 2012, Surf Subsea removed the case to this Court on the ground that the claims necessarily turn on substantial questions of federal law.[23] Surf Subsea subsequently filed a motion to dismiss the claims on the grounds that: (1) federal law does not provide an express private right of action for individuals to obtain declaratory or injunctive relief or to recover damages for alleged violations of the vessel documentation laws; (2) Congress did not intend federal courts to imply a private right of action for declaratory or injunctive relief or damages for alleged violations of the vessel documentation laws; (3) federal law preempts any Louisiana state

---

[18] *Id*. at ¶¶ 38-43.

[19] *Id.* at ¶ 42.

[20] *Id.* at ¶¶ 44-48.

[21] *Id.*

[22] *Id.* at ¶ 48.

[23] R. Doc. No. 1.

law claims based on alleged violations of the vessel documentation laws; and (4) the claims are perempted under state law.[24]

Plaintiffs responded, in part, by moving to remand the case to state court for lack of subject matter jurisdiction.[25] Plaintiffs contend that their state law claims were improperly removed to this Court because they do not raise any federal questions supporting federal jurisdiction.[26] Plaintiffs also oppose the motion to dismiss on the grounds that their state law claims are neither preempted by federal vessel documentation and coastwise trade laws nor perempted under Louisiana law.[27]

For the following reasons, the Court agrees with Surf Subsea that plaintiffs' state law claims necessarily turn on substantial questions of federal law and that the case was properly removed. The Court also agrees that plaintiffs' claims of "fraud-on-the-Coast Guard" impermissibly conflict with federal vessel documentation and coastwise trade laws such that they are preempted in accordance with the U.S. Supreme Court's decision in *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341, 347, 121 S. Ct. 1012, 148 L. Ed. 2d 854 (2001). Because the Court finds that the claims must be dismissed on this ground, the Court does not reach the alternative bases for dismissal raised by the parties.

## DISCUSSION

## I. Motion to Remand

### A. Standard of Law

---

[24] R. Doc. No. 11.

[25] R. Doc. No. 14.

[26] *Id.*

[27] R. Doc. No. 17.

Plaintiffs contend that this matter should be remanded to state court for lack of subject matter jurisdiction. "[A]ny civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending." 28 U.S.C. § 1441(a). A district court must remand a case to state court "[i]f at any time before final judgment it appears that the district court lacks subject matter jurisdiction." 28 U.S.C. § 1447(c). When federal question jurisdiction is challenged by a plaintiff seeking remand, the defendant attempting to establish that removal is proper bears the burden of demonstrating that a federal question exists. *In re Hot–Hed Inc.*, 477 F.3d 320, 323 (5th Cir. 2007) (citing *Carpenter v. Wichita Falls Indep. Sch. Dist.*, 44 F.3d 362, 365 (5th Cir. 1995)). "Any ambiguities are construed against removal because the removal statute should be strictly construed in favor of remand." *Manguno v. Prudential Prop. & Cas. Ins. Co.*, 276 F.3d 720, 723 (5th Cir. 2002) (citing *Acuna v. Brown & Root, Inc.*, 200 F.3d 335, 339 (5th Cir. 2000)).

### B. Federal Question Jurisdiction

Surf Subsea contends that this Court has subject matter jurisdiction in this matter because the claims necessarily implicate federal law and require the construction and application of federal law.[28] To determine whether the claim arises under federal law, the Court must examine the "well pleaded" allegations of the complaint and ignore potential defenses:

> [A] suit arises under the Constitution and laws of the United States
> only when the plaintiff's statement of his own cause of action

---

[28] Plaintiffs correctly note in their reply memorandum that Surf Subsea removed the case solely on the basis of federal question jurisdiction under 28 U.S.C. § 1331. (R. Doc. No. 22, p. 2). The Court agrees with plaintiffs that the notice of removal does not invoke this Court's admiralty and maritime jurisdiction. Although Surf Subsea referenced federal constitutional and statutory grants of admiralty and maritime jurisdiction to establish the final element of the *Grable* test discussed below, the Court does not find, as plaintiffs suggest, that Surf Subsea has attempted to invoke this Court's admiralty jurisdiction by doing so.

> shows that it is based upon those laws or that Constitution. It is not enough that the plaintiff alleges some anticipated defense to his cause of action and asserts that the defense is invalidated by some provision of the Constitution of the United States.

*Louisville & Nashville R. Co. v. Mottley*, 211 U.S. 149, 152, 29 S. Ct. 42, 53 L. Ed. 126 (1908); *see Taylor v. Anderson*, 234 U.S. 74, 34 S. Ct. 724, 58 L. Ed. 1218 (1914). Similarly, a defense raised by a defendant that relies on the preclusive effect of a prior federal judgment, *Rivet v. Regions Bank of La.*, 522 U.S. 470, 118 S. Ct. 921, 139 L. Ed. 2d 912 (1998), or the preemptive effect of a federal statute, *Franchise Tax Bd. of Cal. v. Construction Laborers Vacation Trust for Southern Cal.*, 463 U.S. 1, 103 S. Ct. 2841, 77 L. Ed. 2d 420 (1983), will not provide a basis for removal.[29] A defendant may not remove a case on the basis of an anticipated or even inevitable federal defense, but instead must show that "a well-pleaded complaint establishes either that federal law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law." *Empire Healthchoice Assur., Inc. v. McVeigh*, 547 U.S. 677, 689-90, 126 S. Ct. 2121, 165 L. Ed. 2d 131 (2006) (quoting *Franchise Tax Bd.*, 463 U.S. at 27-28).

Where, as here, the plaintiff does not assert that federal law creates the cause of action, the defendant must establish that state-law claims fall within the "special and small category" of cases that "necessarily raise a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." *Empire Healthchoice*, 547 U.S. at 699; *Grable & Sons Metal*

---

[29] The well-pleaded complaint rule applies with equal force to the original jurisdiction of the district courts pursuant to 28 U.S.C. § 1331 and cases removed from federal court pursuant to 28 U.S.C. § 1441(b). *See Chuska Energy Co. v. Mobil Exploration & Producing North America, Inc.,* 854 F.2d 727, 730 (5th Cir. 1988) (citing *Franchise Tax Board*, 463 U.S. at 12, n. 9). "Section 1441 of the Judicial Code keys the propriety of removal to the original jurisdiction of the federal district courts. Removal under section 1441(b), the basis of removal here, is appropriate only for those claims within the federal question jurisdiction of the district courts, that is, for those actions 'arising under the Constitution, laws, or treaties of the United States.' " *Carpenter v. Wichita Falls Independent School Dist.,* 44 F.3d 362, 366 (5th Cir. 1995) (quoting 28 U.S.C. § 1331).

*Products, Inc. v. Darue Engineering & Mfg.*, 545 U.S. 308, 312-14, 125 S. Ct. 2363, 2366 (2005). This framework "captures the commonsense notion that a federal court ought to be able to hear claims recognized under state law that nonetheless turn on substantial questions of federal law." *Grable*, 545 U.S. at 312. However, "the presence of a disputed federal issue and the ostensible importance of a federal forum are never necessarily dispositive; there must always be an assessment of any disruptive portent in exercising federal jurisdiction." *Id.* at 314 (citing *Merrell Dow Pharmaceuticals Inc. v. Thompson*, 478 U.S. 804, 810, 106 S. Ct. 3229, 92 L. Ed. 2d 650 (1986)). "[T]the federal issue will ultimately qualify for a federal forum only if federal jurisdiction is consistent with congressional judgment about the sound division of labor between state and federal courts."[30] *Grable*, 545 U.S. at 313.

A brief review of the federal vessel documentation and coastwise trade laws underlying the claims asserted in this lawsuit reveals that plaintiffs' claims necessarily turn on substantial questions of federal law. As set forth in Section 27 of the Merchant Marine Act of 1920 (the "Jones Act"), the U.S. government reserves the right to transport merchandise between points in the United States to qualified vessels. *See* 46 U.S.C. § 55102(b). A vessel may not transport merchandise in the U.S. coastwise trade unless the vessel (1) is wholly owned by citizens of the United States for purposes of engaging in the coastwise trade; and (2) has been issued a COD with a coastwise endorsement (or is exempt from documentation but would otherwise be eligible for such a certificate and endorsement). *Id.*

---

[30] As stated by the U.S. Supreme Court, "These considerations have kept us from stating a 'single, precise, all-embracing' test for jurisdiction over federal issues embedded in state-law claims between nondiverse parties. We have not kept them out simply because they appeared in state raiment, as Justice Holmes would have done, but neither have we treated 'federal issue' as a password opening federal courts to any state action embracing a point of federal law. Instead, the question is, does a state-law claim necessarily raise a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." *Grable*, 545 U.S. at 314 (internal citations omitted).

To be deemed a citizen of the United States for the purpose of operating a vessel in the coastwise trade, "at least 75 percent of the interest must be owned by citizens of the United States." 46 U.S.C. § 50501(a).  A corporation satisfies this requirement only if:

> (1) title to at least 75 percent of the stock in the corporation is vested in citizens of the United States free from any trust or fiduciary obligation in favor of a person not a citizen of the United States;
>
> (2) at least 75 percent of the voting power in the corporation is vested in citizens of the United States;
>
> (3) there is no contract or understanding by which more than 25 percent of the voting power in the corporation may be exercised, directly or indirectly, in behalf of a person not a citizen of the United States; and
>
> (4) there is no other means by which control of more than 25 percent of any interest in the corporation is given to or permitted to be exercised by a person not a citizen of the United States.

46 U.S.C. § 50501(d).  The corporation must also satisfy the following requirements to be deemed a citizen of the United States:

> (1) it [must be] incorporated under the laws of the United States or a State;
>
> (2) its chief executive officer, by whatever title, and the chairman of its board of directors [must be] citizens of the United States; and
>
> (3) no more of its directors [may be] noncitizens than a minority of the number necessary to constitute a quorum.

46 U.S.C. § 50501(b).

It is readily apparent that the Court must necessarily construe and apply these federal laws, among others, to resolve the issues underlying the claims asserted in this lawsuit.  As Surf Subsea notes, the claims asserted in Count I of the complaint track the applicable federal statutes seeking a final judgment declaring that Surf Subsea does not meet federal citizenship

requirements for engaging in coastwise trade. In Count II, plaintiffs seek an injunction prohibiting Surf Subsea from engaging in coastwise trade. The only claim that references substantive state law appears in Count III, wherein plaintiffs seek state law damages for violations of the same federal requirements. Despite their attempt to characterize their claims as seeking "only the determination of facts, not the interpretation of federal law," the Court cannot declare that Surf Subsea does not meet the Jones Act's citizenship requirements, or effectively cancel the SURF CHALLENGER's COD, without construing and applying the federal vessel documentation and coastwise trade laws. *See, e.g.*, *Hughes v. Chevron Phillips Chemical Co. LP*, 2012 WL 1957906, at *3 (5th Cir. May 31, 2012) (unpublished) (holding that it would be impossible to determine the plaintiff's state-law claims without deciding whether the defendant's actions were authorized by a valid administrative levy issued by the IRS); *Drawhorn v. Qwest Communications Intern., Inc.*, 121 F. Supp. 2d 554, 562 (E.D. Tex. 2000) (Cobb, J.) ("Plaintiffs cannot walk into court and ask to have their rights declared without the court interpreting the federal statutes since the [defendants'] rights derive from these statutes."). The Court may reach a decision on the merits of plaintiffs' claims only by applying the federal vessel documentation and coastwise trade laws to the facts and making a determination as to the legality of any representations made by Surf Subsea to the Coast Guard regarding its citizenship.[31]

The construction and application of these federal documentation and coastwise trade laws is actually disputed and substantial. The claims depend on whether plaintiffs can prove that Surf

---

[31] The Court notes that the claims in Counts I and II appear to raise only issues of federal law. Although plaintiffs do not address the nature of their claims in Counts I and II, i.e., whether they are state or federal claims, *see, e.g.*, *Budget Prepay, Inc. v. AT&T*, 605 F.3d 273, 278-80 (5th Cir. 2010) (considering whether declaratory judgment claims were state or federal *before* considering whether the state law claims raised substantial federal questions), Surf Subsea correctly noted that if Counts I and II are purely federal claims, the Court may exercise supplemental jurisdiction over the claims in Count III. (R. Doc. No. 15, nn. 3 &4); *see also* Notice of Removal, ¶¶ IX-XI. (R. Doc. No. 1).

Subsea is not eligible to operate the SURF CHALLENGER in coastwise trade by demonstrating, among other things, the existence of foreign "control," and that "there exist other means by which control of more than 25 percent of an interest in [Surf Subsea] is given to or permitted to be exercised by a person not a citizen of the United States." As discussed in greater detail below, these allegations raise important questions of federal law with respect to the regulation of vessel documentation and coastwise trade, which have been placed directly in issue in this case. The primacy of the federal issues in plaintiffs' claims raises a "serious federal interest in claiming the advantages thought to be inherent in a federal forum." *See Grable*, 545 U.S. at 313. In other words, this is not a case in which the federal interest is "only tangentially relevant to an element of a state tort claim."[32] *See Singh v. Duane Morris, LLP*, 538 F. 3d 334 (5th Cir. 2008) (holding that a legal malpractice claim did not arise under federal law even though it involved questions relating to the plaintiff's representation in a federal trademark lawsuit).

Finally, the Court finds that entertaining the novel theory of liability underlying the claims asserted in this action will not disturb any congressionally approved balance of federal and state judicial responsibilities. The claims in this case turn on the construction and application of federal vessel documentation and coastwise trade laws. Exercising jurisdiction will not upset the "federal-state" division of labor because few, if any, state law claims implicate issues concerning the Coast Guard's issuance of CODs, or the application of federal vessel documentation laws. As Surf Subsea notes, all prior actions relating to violations of the citizenship requirements have proceeded either as enforcement actions by the Coast Guard

---

[32] The Court does not decide whether a substantial federal question would be implicated if plaintiffs' state law claims had been filed *after* a determination by the Coast Guard that Surf Subsea had intentionally misrepresented the extent of its foreign ownership. Had the Coast Guard already found that Surf Subsea does not meet U.S. citizenship requirements and/or cancelled the SURF CHALLENGER's COD, the case may have been more analogous to those in which any federal issues were "merely floating on the periphery" of traditional state law claims. *See, e.g.*, *Roof Technical Servs., Inc. v. Hill*, 679 F. Supp. 2d 749 (N.D. Tex 2010); *Singh v. Duane Morris, LLP*, 538 F. 3d 334 (5th Cir. 2008)).

against a vessel owner, or as actions by private persons against the Coast Guard under the Administrative Procedure Act.[33] Moreover, the Court agrees that federal vessel documentation and coastwise trade laws represent a subject of greater concern to federal courts, and one for which uniformity is highly desirable. Accordingly, "there is no good reason to shirk from federal jurisdiction over the dispositive and contested federal issue at the heart" of this case. *See Grable*, 545 U.S. at 319-20.

## II. Motion to Dismiss

### A. Standard of Law

A district court may dismiss a complaint, or any part of it, for failure to state a claim upon which relief can be granted if the plaintiff has not set forth a factual allegation in support of his claim that would entitle him to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 1964-65, 167 L. Ed. 2d 929 (2007); *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007). As the Fifth Circuit explained in *Gonzalez v. Kay:*

> "Factual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). The Supreme Court recently expounded upon the *Twombly* standard, explaining that "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, --- U.S. ---, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Twombly,* 550 U.S. at 570, 127 S.Ct. 1955, 167 L.Ed.2d 929). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* It follows that "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not 'show[n]'-'that the pleader is entitled to relief.'" *Id.* at 1950 (quoting Fed.R.Civ.P. 8(a)(2)).

---

[33] The Court notes that neither the parties nor this Court's research uncovered a single case endorsing the novel theory of liability asserted in this case.

577 F.3d 600, 603 (5th Cir. 2009).

This Court will not look beyond the factual allegations in the pleadings to determine whether relief should be granted. *See Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999); *Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir. 1996). In assessing the complaint, a court must accept all well-pleaded facts as true and liberally construe all factual allegations in the light most favorable to the plaintiff. *Spivey*, 197 F.3d at 774; *Lowrey v. Tex. A & M Univ. Sys.*, 117 F.3d 242, 247 (5th Cir. 1997). "Dismissal is appropriate when the complaint 'on its face show[s] a bar to relief.'" *Cutrer v. McMillan*, 308 Fed. Appx. 819, 820 (5th Cir. 2009) (quoting *Clark v. Amoco Prod. Co.*, 794 F.2d 967, 970 (5th Cir. 1986)).

### B. Preemption Analysis

Surf Subsea contends that the complaint must be dismissed for failure to state a claim upon which relief may be granted because federal vessel documentation and coastwise trade laws preempt the state law tort claims asserted in this matter. The U.S. Constitution provides that federal law "shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. "Federal law will override state law under the Supremacy Clause when (1) Congress expressly preempts state law; (2) Congressional intent to preempt may be inferred from the existence of a pervasive federal regulatory scheme; or (3) state law conflicts with federal law or its purposes."[34] *Frank v. Delta Airlines, Inc.*, 314 F.3d 195, 197 (5th Cir. 2001) (citing *English v. General Elec. Co.*, 496 U.S. 72, 78-79, 110 S. Ct. 2270, 110 L. Ed. 2d 65 (1990)). A conflict occurs "(1) where complying with both federal law and state law is impossible; or (2) where the state law creates an

---

[34] "Pre-emption may be either express or implied, and 'is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose.' " *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 152-53, 102 S. Ct. 3014, 73 L. Ed. 2d 664 (1982) (quoting *Jones v. Rath Packing Co.*, 430 U.S. 519, 525, 97 S. Ct. 1305, 51 L. Ed. 2d 604 (1977)).

unacceptable obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Castro v. Collecto, Inc.*, 634 F.3d 779, 785 (5th Cir. 2011) (quoting *Wyeth v. Levine*, 555 U.S. 555, 129 S. Ct. 1187, 173 L. Ed. 2d 51 (2009)) (quotation marks omitted). "The critical question in any pre-emption analysis is always whether Congress intended that federal regulation supersede state law." *La. Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 369, 106 S. Ct. 1890, 90 L. Ed. 2d 369 (1986).

"In preemption analysis, courts should assume that 'the historic police powers of the States' are not superseded 'unless that was the clear and manifest purpose of Congress.'" *Arizona v. United States*, --- U.S. ---, 132 S. Ct. 2492, 2501, 183 L. Ed. 2d 351 (2012) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S. Ct. 1146, 1152, 91 L. Ed. 1447 (1947)). As stated by the U.S. Supreme Court,

> [B]ecause the States are independent sovereigns in our federal system, we have long presumed that Congress does not cavalierly pre-empt state-law causes of action. In all pre-emption cases, and particularly in those in which Congress has legislated in a field which the States have traditionally occupied, we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.

*Medtronic, Inc. v. Lohr*, 518 U.S. 470, 484-85, 116 S. Ct. 2240, 135 L. Ed. 2d 700 (1996) (citations, quotations, and alterations omitted). However, "the primacy of the state's police powers is not universal." *Lofton v. McNeil Consumer & Specialty Pharm.*, 672 F.3d 372, 378 (5th Cir. 2012). "[A]n 'assumption' of non pre-emption is not triggered when the State regulates in an area where there has been a history of significant federal presence." *United States v. Locke*, 529 U.S. 89, 90, 120 S. Ct. 1135, 1139, 146 L. Ed. 2d 69 (2000); *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341, 347, 121 S. Ct. 1012, 148 L. Ed. 2d 854 (2001). *See also Villas at Parkside Partners v. City of Farmers Branch, Tex.*, 675 F.3d 802, 810-11 (5th Cir.

2012) ("[T]he City's Ordinance does not regulate in an area historically occupied by the states, and the district court correctly declined to afford it a presumption of validity.") *rehearing en banc granted*, 688 F.3d 801 (5th Cir. July 31, 2012).

In *Buckman*, the U.S. Supreme Court declined to apply a presumption against preemption of state law tort claims turning on allegations of fraud on a federal agency. The plaintiffs in *Buckman* claimed to have suffered injuries as a result of using orthopedic bone screws. Their claims turned on allegations that a regulatory consultant for the bone screw manufacturer had obtained approval to market the screws by making fraudulent representations to the Food and Drug Administration (the "FDA"). The Court explained that such claims of "fraud-on-the-FDA" enjoyed no presumption against preemption because "the relationship between a federal agency and the entity it regulates is inherently federal in character." *Buckman*, 531 U.S. at 347. The consultant's allegedly fraudulent "dealings with the FDA were prompted by [federal law], and the very subject matter of [the consultant's] statements were dictated by [federal law]." *Id.* at 347-48. As a result, the Court distinguished these "uniquely federal" claims from traditional state law tort claims implicating federalism and the primacy of state regulation of matters of health and safety. *See id.* The Court explained that there could be no presumption against preemption in *Buckman* because "[p]olicing fraud against federal agencies is hardly "a field which the States have traditionally occupied." *Id.* at 347.

Having declined to apply a presumption against preemption, the *Buckman* Court went on to explain that the plaintiff's state law fraud-on-the-FDA claims impermissibly conflicted with a delicate regulatory balance established by the Federal Food, Drug, and Cosmetic Act ("FDCA"), 52 Stat. 1040, as amended by the Medical Device Amendments of 1976 ("MDA"), 90 Stat. 539, 21 U.S.C. § 301 (1994 ed. and Supp. V). The Court noted that Congress had enacted the

comprehensive scheme to regulate the process in which the allegedly fraudulent statements had been submitted to the FDA. The regulations set forth specific disclosure requirements accompanied by various provisions aimed at detecting, deterring, and punishing false statements. Because maintaining a flexible approach to enforcement was "a critical component of the statutory and regulatory framework under which the FDA pursue[d] difficult (and often competing) objectives," the Court held that state law fraud-on-the-FDA claims would "inevitably conflict with the FDA's responsibility to police fraud consistently with the Administration's judgment and objectives." *Id*. at 349-50.

Specifically, the *Buckman* Court noted two ways in which state tort liability would conflict with the federal regulatory scheme. First, the Court explained that state tort liability would impermissibly increase the burdens of complying with the regulatory scheme. The Court reasoned that

> complying with the FDA's detailed regulatory regime in the shadow of 50 States' tort regimes will dramatically increase the burdens facing potential applicants-burdens not contemplated by Congress . . . . Would-be applicants may be discouraged from seeking § 510(k) approval of devices with potentially beneficial off-label uses for fear that such use might expose the manufacturer or its associates (such as petitioner) to unpredictable civil liability. In effect, then, fraud-on-the-FDA claims could cause the Administration's reporting requirements to deter off-label use despite the fact that the FDCA expressly disclaims any intent to directly regulate the practice of medicine . . . and even though off-label use is generally accepted.

*Id.* at 350-51.

Second, the Court explained that fraud-on-the-FDA claims would frustrate regulatory objectives by increasing the burdens on the agency's processes. The Court explained that because of the increased potential for litigation,

> [a]pplicants would . . . have an incentive to submit a deluge of
> information that the Administration neither wants nor needs,
> resulting in additional burdens on the FDA's evaluation of an
> application. As a result, the comparatively speedy § 510(k) process
> could encounter delays, which would, in turn, impede competition
> among predicate devices and delay health care professionals'
> ability to prescribe appropriate off-label uses.

*Id.* at 351.

Finally, the *Buckman* Court distinguished decisions in which it had applied a presumption against preemption when finding that certain state law causes of action were not preempted by federal law in other contexts. The Court explained that unlike claims based on traditional state tort law principles, the claims asserted in *Buckman* "exist[ed] soley by virtue of [federal] disclosure requirements." *Id.* at 351-53. The Court also distinguished situations where Congress has disclaimed any interest in preempting state tort law. The Court found "clear evidence that Congress intended that the MDA be enforced exclusively by the Federal Government." *See id.*

At least one federal court of appeals has applied the reasoning in *Buckman* when finding fraud-on-the-agency claims preempted in other contexts. In *Nathan Kimmel, Inc. v. DowElanco*, 275 F.3d 1199 (9th Cir. 2002), the U.S. Court of Appeals for the Ninth Circuit extended the reasoning in *Buckman* to state law claims turning on allegations of fraud-on-the-Environmental Protection Agency ("EPA"). The plaintiff in *Nathan Kimmel* manufactured protective bags in which food and medicine can be stored in areas being fumigated with Vikane, a federally regulated pesticide used to exterminate termites. The plaintiff alleged that the makers of Vikane submitted false information to the EPA when applying for a label-change that would exclude the plaintiff's product from the list of EPA-approved protective bags. The plaintiff sought injunctive relief based on a theory of unfair business practices and damages for intentional interference with a prospective economic advantage.

After reviewing the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA") and the Supreme Court's decision in *Buckman*, the Ninth Circuit found that, as in *Buckman*, the plaintiff's fraud-on-the-EPA claims were not entitled to a presumption against preemption. The Court also found that the plaintiff's claims impermissibly conflicted with the federal regulatory scheme established by the FIFRA. The Court explained that "just as Congress made available to the FDA regulatory enforcement mechanisms under the MDA, Congress has afforded the EPA substantial enforcement powers under FIFRA that enable the EPA to make a measured response to suspected fraud against it." *Id.* at 1205-06. The Ninth Circuit also distinguished the claims from permissible parallel state tort claims that are not preempted. The Ninth Circuit explained that the "key factor" driving the preemption analysis in *Buckman* was the existence of federal enactments administered by a federal agency as a critical element in the plaintiff's case. The Ninth Circuit further emphasized the problems inherent in allowing state law to define the propriety of disclosures made by an applicant to a federal agency, including those recognized by the Supreme Court in *Buckman*. "In particular," the Court reasoned, "we are troubled that an applicant's disclosures under FIFRA, although not challenged by the EPA (the very agency empowered by Congress to enforce FIFRA), may be judged illegal under state law." *Id.* at 1207.

More recently, in *Lofton v. McNeil Consumer & Specialty Pharm.*, 672 F.3d 372, 378 (5th Cir. 2012), the U.S. Court of Appeals for the Fifth Circuit underscored that the relationship between a federal regulator and the regulated entity is "the dispositive factor for federal preemption in *Buckman*." In *Lofton*, the Fifth Circuit applied the reasoning in *Buckman* to a Texas statute authorizing failure to warn claims against a drug manufacturer that "withholds" or "misrepresents" "material" information "required" by the FDA. After examining a circuit split concerning preemption of a similar Michigan statute, the Fifth Circuit declined to

apply a presumption against preemption, and it held that the fraud-on-the-FDA claims authorized by the Texas statute conflict with federal law. The Fifth Circuit explained that the Texas statute permits two kinds of interference in cases where the FDA, itself, has not yet found fraud. First, the statute "allows the state court to interject varying views on what disclosures are sufficient," which causes the FDA to lose control over its ability to "intelligently limit" the scope of disclosures necessary for its work based on scientific expertise. Second, the statute authorizes lawsuits that "may directly invade the agency's processes when close questions of 'withholding' or 'misrepresentation' arise." The Fifth Circuit made clear that "[t]hese dangers are inherent in *Buckman's* concern to preserve the agency's discretion to police the conduct of regulated entities."

In this case, the Court similarly finds that plaintiffs' claims of "fraud-on-the-Coast Guard" would exert an impermissible "extraneous pull" on the comprehensive regulatory scheme established by Congress and administered by the Coast Guard to regulate federal vessel documentation and coastwise trade. *See Buckman*, 531 U.S. at 353. As a preliminary matter, plaintiff's fraud-on-the-Coast Guard claims are not entitled to any presumption against preemption because they do not implicate federalism concerns or the historic primacy of state regulation of matters of health and safety. Rather, as in *Buckman*, the relationship between the Coast Guard and Surf Subsea is "inherently federal in character." Surf Subsea's dealings with the Coast Guard were "prompted by" the Jones Act, and the "very subject matter of [its] statements were dictated by that statute's provisions." *See id.* at 347-48. The relationship between Surf Subsea and the Coast Guard "originates from, is governed by, and terminates according to federal law." *See id.* at 347. Plaintiffs cannot obtain a presumption against

preemption while attempting to "police" fraud on the Coast Guard, which is "hardly a field which the States have traditionally occupied." *See id.*

Plaintiffs' novel fraud-on-the-Coast Guard claims conflict in several ways with the comprehensive scheme established by Congress to regulate vessel documentation and coastwise trade. As noted by the Supreme Court,

> The basic form for the comprehensive federal regulation of trading and fishing vessels was established in the earliest days of the Nation and has changed little since. Ships engaged in trade with foreign lands are "registered," . . . . The purpose of a register is to declare the nationality of a vessel and to enable her to assert that nationality wherever found. Vessels engaged in domestic or coastwise trade or used for fishing are "enrolled" . . . . The purpose of an enrollment is to evidence the national character of a vessel and to enable such vessel to procure a license.

*Douglas v. Seacoast Products, Inc.*, 431 U.S. 265, 272-73, 97 S. Ct. 1740, (1977) (citations, alterations, and quotation marks omitted). *See also United States v. Locke*, 529 U.S. 89, 100, 120 S. Ct. 1135, 146 L. Ed. 2d 69 (2000) (reviewing early Supreme Court decisions recognizing the preemptive effect of comprehensive federal laws regulating certification of vessels).

The vessel documentation and coastwise trade laws are now set forth in the U.S. Code and administered by the Coast Guard. Under the current vessel documentation and coastwise trade laws, a qualified vessel may participate in the U.S. coastwise trade "only if the vessel has been issued a certificate of documentation with an endorsement for that trade . . . ." 46 U.S.C. § 12102(a). A certificate of documentation may be obtained from the Coast Guard by filing an Application for Initial Issue, Exchange, or Replacement of Certificate of Documentation; or Redocumentation (form CG-1258). 46 U.S.C. § 12104; 46 C.F.R. § 67.141. A COD with a coastwise endorsement may be issued upon the filing of the application and a "determination of qualification by the Director, National Vessel Documentation Center . . . ." 46 C.F.R. § 67.15(b).

At that point, "a vessel for which a coastwise endorsement is issued may engage in the coastwise trade." 46 U.S.C. § 12112(b).

The Coast Guard's process for determining the citizenship of applicants seeking to document vessels with coastwise endorsements relies on self-certification. While an endorsed certificate is "conclusive evidence" of the vessel's qualification to be used in accordance with the endorsement, the certificate is "not conclusive evidence of ownership in a proceeding in which ownership is in issue." 46 U.S.C. § 12134. A properly completed application for a COD with a coastwise endorsement merely establishes "a rebuttable presumption that the applicant is a United States citizen." 46 C.F.R. § 67.43. The Coast Guard has express statutory authorization to investigate representations made by applicants and "to ensure compliance with . . . laws governing the qualifications of vessel to engage in the coastwise trade . . . ." 46 U.S.C. §§ 12105(d), 12139(a).

In a recent investigation into the citizenship status of Trico Marine Services, Inc., the Acting Director of the National Vessel Documentation Center ("NVDC") summarized the basic principles regarding investigations of representations concerning citizenship:

> It is a long and well-established practice under the vessel documentation laws and their administration by the NVDC that the application for a Certificate of Documentation with a trade endorsement of any kind by an applicant is accepted and processed based upon the self-certification by the applicant as to its, and the vessel's qualifications for a Certificate of Documentation with the particular endorsement sought. Thus, in the case of citizenship, 46 C.F.R. § 67.43 establishes a rebuttable presumption for administrative purposes that an applicant is a United States citizen by the receipt by the NVDC of a properly completed form CG-1258. Since the process relies on self-certification, however, that presumption is rebuttable and, when evidence of possible non-qualification is found, the burden is upon the applicant to establish its qualifications.

*See* Timothy V. Skuby, Acting Director, National Vessel Documentation Center, *Coast Guard Report of Administrative Investigation of Trico Marine Services, Inc.* (Jan. 12, 2011), *available at* http://www.uscg.mil/hq/cg5/nvdc/nvdcreport.asp.[35]

The Coast Guard is empowered to impose severe penalties for violations of the vessel documentation statues and regulations which it is charged with enforcing. Specifically, the Jones Act provides that merchandise transported in the U.S. coastwise trade by foreign owned vessels is

> liable to seizure by and forfeiture to the Government. Alternatively, an amount equal to the value of the merchandise (as determined by the Secretary of Homeland Security) or the actual cost of the transportation, whichever is greater, may be recovered from any person transporting the merchandise or causing the merchandise to be transported.

46 U.S.C. § 55102(c). The vessel documentation statute further provides that "[a] person that violates this chapter or a regulation prescribed under this chapter is liable to the United States Government for a civil penalty of not more than $10,000. Each day of a continuing violation is a

---

[35] The results of this investigation are particularly instructive with respect to the nature of regulatory enforcement. Upon receiving "credibly documented allegations" challenging the U.S. citizenship of Trico Marine Services, Inc., a publicly traded company, the Coast Guard investigated the entity's ownership and financing structure. The investigation resulted in a report setting forth findings of fact and a detailed analysis of the statutory and regulatory citizenship requirements. The report concluded that the CODs for Trico's vessels were improperly issued. The report recommended that the CODs be cancelled and that civil penalties be assessed. The report reserved a decision with respect to seizure and forfeiture subject to possible further findings as to the *mens rea* of the violating entities. Notably, because the decision raised potentially significant issues for publicly traded companies operating in the U.S. coastwise trade, the Coast Guard recommended soliciting ideas from the public as to how publicly traded companies comply with Coast Guard citizenship requirements. The Director of Prevention and Policy for Marine Safety, Security, and Stewardships approved the assessment of certain civil penalties, but declined to approve the recommendations concerning cancellation of the CODs and seizure or forfeiture. *See* K.S. Cook, RADM, CG-54, *Trico Final Action Memorandum* (Feb. 24, 2011) *available at* http://www.uscg.mil/hq/cg5/nvdc/nvdcreport.asp. The recommendation for public notice was also approved. The notice was eventually published in the Federal Register on November 3, 2011, and it has received several comments from the public. *See* Mechanisms of Compliance with United States, Citizenship Requirements for the Ownership of Vessels Eligible To Engage in Restricted Trades by Publicly Traded Companies, 76 Fed. Reg. 68203 (Nov. 3, 2011) *available at* http://www.regulations.gov/#!docketDetail;D=USCG-2011-0619. Also available on this website are the notes of a recent meeting concerning the Trico enforcement action. *See* Notes of Meeting Held at Beacon Hotel, Washington, DC (Sept. 13, 2012). The notes of this meeting illustrate the complexity of the regulatory environment, and they highlight the Coast Guard's role in regulating coastwise trade against "difficult (and often competing) objectives." *See Buckman*, 531 U.S. at 349-50.

separate violation."  46 U.S.C. § 12151(a).  A vessel and its equipment are also liable to seizure

by and forfeiture to the government if

> (1) the owner of the vessel or the representative or agent of the owner knowingly falsifies or conceals a material fact, or knowingly makes a false statement or representation, about the documentation of the vessel or in applying for documentation of the vessel; [or]

> (2) a certificate of documentation is knowingly and fraudulently used for the vessel . . . .

46 U.S.C. § 12151(b).

As plaintiffs recognize, however, the statutory enforcement provisions noticeably "do[]

not provide a private right of action for damages to a vessel owner injured by a competitor's

falsification of a COD application and wrongful competition."  (R. Doc. No. 17, p. 6.).  Also

absent from the scheme is any requirement for public notice with respect to vessel

documentation applications, or any right to public participation in the vessel documentation

process.  The framework contemplates only the relationship between the Coast Guard and the

applicant certifying its eligibility to participate in the U.S. coastwise trade, along with appellate

rights for "[a]ny person directly affected by a decision or action taken . . . ." *See* 46 C.F.R. §

67.12.

Against this background, state law tort claims of "fraud-on-the-Coast Guard" present an

impermissible obstacle to the accomplishment of the regulatory objectives of Congress.  The

claims asserted in this matter threaten to impose extraneous burdens on the Coast Guard's

administration of federal vessel documentation laws by subjecting applicants for vessel

documentation to "the shadow of 50 states' tort regimes." *See Buckman*, 531 U.S. 350-51.  The

additional burdens of litigation over representations made in the course of a federally

administered application process would increase the cost of obtaining vessel documentation and

frustrate coastwise trade. The fear of such litigation would undoubtedly lead to greater burdens on the Coast Guard's administration of the vessel documentation laws as it would undermine the flexible self-certification procedures it has long employed to achieve its regulatory purposes.

Moreover, the Court agrees with Surf Subsea that plaintiffs' claims are an improper attempt to supplement the express remedies provided by federal law for violations of the vessel documentation laws with a state-law cause of action. Permitting plaintiffs to invoke state law penalties for violations of the vessel documentation statutes and regulations would conflict with the enforcement scheme established by federal law and administered by a federal agency. *Cf. Arizona v. United States*, --- U.S. ---, 132 S. Ct. 2492, 2501-02, L. Ed. 2d (2012) (holding that additional state law misdemeanor penalties for conduct regulated by federal alien registration laws would conflict with the framework enacted by Congress). Fraud-on-the-Coast Guard claims have the potential to result in state law penalties which are greater (or less) than those which would otherwise be deemed appropriate by the Coast Guard, if penalties were deemed appropriate at all. There is also a danger that state or federal courts would find (or reject) liability based on a construction or application of law that conflicts with an interpretation originating from the agency charged with administering the law. *See Lofton v. McNeil Consumer & Specialty Pharm.*, 672 F.3d 372, 380 (5th Cir. 2012), ("[T]he statutory requirement of proving fraud-on-the-FDA may directly invade the agency's processes when close question of 'withholding' or 'misrepresentation' arise."); *Nathan Kimmel*, 275 F.3d at 1206-07 ("[W]e are troubled that an applicant's disclosures under FIFRA, although not challenged by the EPA (the very agency empowered by Congress to enforce FIFRA), may be judged illegal under state law."). As the Fifth Circuit explained in *Lofton*, "These dangers are inherent in *Buckman's*

concern to preserve the agency's discretion to police the conduct of regulated entities." 672 F.3d at 380.

The Court similarly finds that the claims in this case are distinguishable from those based on parallel state tort law duties which do not conflict with federal law. *See, e.g.*, *Riegel v. Medtronic, Inc.*, 552 U.S. 312, 128 S. Ct. 999, 169 L. Ed. 2d 892 (2008); *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 116 S. Ct. 2240, 135 L. Ed. 2d 700 (1996); *Silkwood v. Kerr–McGee Corp.*, 464 U.S. 238, 104 S. Ct. 615, 78 L. Ed. 2d 443 (1984); *Hughes v. Boston Scientific Corp.*, 631 F.3d 762 (5th Cir. 2011). The "key factor" distinguishing parallel state law tort claims from fraud-on-the-agency claims is the fact that a federal enactment administered by a federal agency is the critical element in a fraud-on-the-agency case. *See Nathan Kimmel*, 275 F.3d at 1206-07; *Buckman*, 531 U.S. at 347-48, 351-53; *Lofton*, 672 F.3d at 377 (explaining that parallel claims "do not involve the relationship between a federal regulator and the regulated entity, the dispositive factor for federal preemption"). Although couched in terms of unfair trade practices under Louisiana law, the claims in this case "exist solely by virtue of the [certification] requirements," and do not turn on traditional state tort law principles. *See Lofton*, 672 F.3d at 379 (quoting *Buckman*, 531 U.S. at 353). Rather, the claims are a thinly veiled attempt to create a "freestanding federal cause of action based on violations of the [Coast Guard's] regulations." *See Hughes*, 631 F.3d at 775. The difference is important because such claims "depend on speculation" that the Coast Guard would have taken a particular regulatory action in response to Surf Subsea's representations, *see Hughes*, 631 F.3d at 775-76; *Buckman*, 531 U.S. at 353-54 (Stevens, J., concurring), and they invite state courts (or federal courts applying state law) to interfere with the Coast Guard's role in making important regulatory decisions as intended by Congress. *Nathan Kimmel*, 275 F.3d at 1206-07; *Lofton*, 672 F.3d at 380. Accordingly,

plaintiffs' claims cannot escape preemption on the ground that they merely impose parallel state law tort duties.

In summary, plaintiffs' state law claims are not entitled to a presumption against preemption, and they conflict with longstanding federal vessel documentation and coastwise trade laws. Congress entrusted the task of enforcing these laws with a federal agency as part of comprehensive legislative effort to regulate an area of historic national importance. Permitting collateral attacks on representations made during the application process for vessel documentation would increase the cost of engaging in the U.S. coastwise trade, and it would frustrate the processes of the Coast Guard in ways not contemplated by Congress. It would also undermine the Coast Guard's ability to enforce these laws on behalf of the government. As stated by the U.S. Supreme Court in *Buckman*, "we think this sort of litigation would exert an extraneous pull on the scheme established by Congress, and it is therefore pre-empted by that scheme."

## CONCLUSION

For the foregoing reasons,

**IT IS ORDERED** that the motion to remand is **DENIED.**

**IT IS FURTHER ORDERED** that the motion to dismiss is **GRANTED**. Plaintiffs' claims are **DISMISSED WITH PREJUDICE.**


New Orleans, Louisiana, October 17, 2012.

**LANCE M. AFRICK**
**UNITED STATES DISTRICT JUDGE**